Jesse SANCHEZ, et al., Plaintiffs,

v.

CITY OF SANTA ANA,
et al., Defendants.

No. CV 79–1818 KN.

United States District Court,
C.D. California.

Nov. 22, 1995.

Meir J. Westreich, Glendale, California, Mark Rosenbaum, ACLU Foundation of Southern California, Los Angeles, California, La'Chelle M. Woodert, Inglewood, California, for Plaintiffs.

Edward J. Cooper, City Attorney, City of Santa Ana, Santa Ana, California, Charles W. Matheis, Jr., Beam, Brobeck & West, Santa Ana, California, for Defendants City of Santa Ana, Raymond C. Davis and E.B. Hansen.

Daniel F. Fears, Karen O. Strauss, Payne & Fears, Irvine, California, for Defendants Robert Stebbins, Norwood Williams, Lawrence Pitzer, Michael Lewellen, William Bruns and Dale Sterzer.

## ORDER Re: PLAINTIFFS' DISPARATE IMPACT CLAIMS

KENYON, District Judge.

Based on the bench trial of July 18–27, 1995 and the papers submitted, the Court ISSUES the following Order on Plaintiffs' disparate impact claims.[1] The Court ORDERS defendant the City of Santa Ana to file and serve its Proposed Findings of Fact and Conclusions of Law and a Proposed Judgment in accordance with this Order within fourteen days from the issuance of this Order.

## I. BACKGROUND

On remand from the Ninth Circuit, the following claims were tried before this Court: Plaintiffs Sanchez's and Torres's claims against defendant City of Santa Ana ("the City") under Title VII, 42 U.S.C. § 2000e *et seq.*, for the alleged discriminatory impact of the City's pay and promotion policies upon Plaintiffs. *See generally Sanchez v. City of Santa Ana,* 915 F.2d 424 (9th Cir.1990), *cert. denied,* 502 U.S. 815, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991) ("*Sanchez II*"); *Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir. 1990), *cert. denied,* 502 U.S. 957, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991) ("*Sanchez I*").

## II. ANALYSIS

■ "A disparate impact claim challenges employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1423 (9th Cir.1990) (citations and internal quotation omitted). In contrast to a disparate treatment claim, which focuses on discriminatory intent, a disparate impact claim focuses "on statistical disparities, rather than specific incidents, and on competing explanations for these disparities." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988); *Rose,* 902 F.2d at 1424.

■ "In order to establish a prima facie case of disparate impact, a plaintiff must: (1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; 'that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Rose,* 902 F.2d at 1424 (quoting *Watson,* 487 U.S. at 994, 108 S.Ct. at 2789 (plurality opinion)); *see also Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–57, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989) (adopting plurality opinion of *Watson*).

■ "Once the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant who may either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists." *Rose,* 902 F.2d at 1424. "The employer may also produce evidence that its disparate employment practices are based on legitimate business reasons, such as job-relatedness or business necessity." *Id.* Thereafter, the plaintiff "must ... either meet the burden of persuasion in disproving the existence of a business justification for an identified impact, or propose equally effective alternatives to the challenged practice" that would not have a similarly undesirable discriminatory effect. *Atonio v. Wards Cove Packing Co.,* 10 F.3d 1485, 1497 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 57, 130 L.Ed.2d 16 (1994) ("*Atonio*") (internal citations omitted).

### A. Plaintiffs' prima facie case
### 1. Identify the specific employment practices or selection criteria being challenged.

Plaintiffs identify three employment practices of the Santa Ana Police Department

---

1. The Court believes that the papers submitted by both parties, and by Plaintiffs in particular, are fairly imprecise as to the legal arguments and factual contentions they advance. Given that fact, the Court believes that it has addressed all of the parties' salient arguments in this Order.

("SAPD") that allegedly had a disparate impact on Hispanics: (1) the 1977–78 sergeant promotional examination; specifically, (a) the written examination and (b) the service requirement and seniority point bonuses[2]; (2) the City's merit pay policy; and (3) the City's policy regarding the special Crime Scene Investigator ("CSI") pay.

### 2. Show a racial disparity.

■ In showing disparate impact, the "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." *Wards Cove*, 490 U.S. at 650, 109 S.Ct. at 2121. In cases where such labor market statistics are difficult if not impossible to ascertain, disparate impact can also be shown by "measures indicating the racial composition of 'otherwise-qualified applicants' for at-issue jobs." *Id.* at 651, 109 S.Ct. at 2121. *See also Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir.), *reh'g denied*, 13 F.3d 296 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994) ("plaintiff proves discriminatory impact by showing statistical disparities between the number of protected class members in the qualified applicant group and those in the relevant segment of the workforce").

■ In determining adverse impact, the Ninth Circuit analyzes whether "the statistical disparity is 'substantial' or 'significant' in a given case." *Clady v. County of Los Angeles*, 770 F.2d 1421, 1428 (9th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). To make this determination, courts have looked to the so-called "80% rule" for guidance. *See* Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines"), 29 C.F.R. Part 1607 (1984). According to this rule, a selection device normally is considered to have adverse impact if it has a "selection rate for any race, sex, or ethnic group which is less than four-fifths (or eighty percent) of the

rate of the group with the highest rate ..." *Id.*, § 1607.–4(D). *See also Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991) ("while the [Uniform Guidelines] are not dispositive, they are instructive" in determining disparate impact).

"Disparate impact should always be measured against the actual pool of applicants or eligible employees unless there is a characteristic of the challenged selection device that makes use of the actual pool of applicants or eligible employees inappropriate." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir.1983). Both Plaintiffs and the City use the 144 Santa Ana police officers who took the written examination as the actual pool of applicants for purposes of statistical analysis.

### (a)(1) Whether racial disparity was shown as to the written examination.

■ Plaintiffs allege that the written examination had a disparate impact on Hispanic applicants. Both Plaintiffs and the City use the 144 Santa Ana police officers who took the written examination to analyze whether the written examination had a disparate impact on Hispanics. Of the 144 officers taking the test, 108 candidates were white and 29 were Hispanic. Exh. 666.8.

Plaintiffs offer the following evidence to show disparate impact: (1) Under Santa Ana City Code Section 9.41, the presumptive passing score on any test is 70% of the raw score, which then can be "an adjusted score, when adjudged necessary ... based upon consideration of the test, the quality of the competition and the needs of the [C]ity." Exh. 812. (2) Of the 144 applicants who took the test, 36 had raw scores of 70% or better, of which 1 was Hispanic and 34 were white. Exhs. 872.2, 873. (3) The selection rate for Hispanic candidates (1/29) was 10.8% of that for white candidates (34/108), such rate vio-

---

**2.** Plaintiffs contend generally that the promotional selection process had a disparate impact, and advance several theories of disparate impact in promotion, some of which relate to the effects of past discrimination in the SAPD. *See* Pls. Pretrial Conference Statement, pp. 20–22; Pls. Closing Brief ("Pls. Brief"), p. 14. As required by

*Wards Cove*, Plaintiffs are required to identify specific practices that had a disparate impact. *See* n. 17, *infra*. To conduct the analysis, the Court finds that Plaintiffs' general allegations identify these specific practices and/or selection criteria, as contemplated under Title VII.

lating the 80% rule and demonstrating "significant" statistical disparity. Exh. 871.3. Plaintiffs also calculated that the difference in the performances of whites and Hispanics was statistically significant. Exh. 871.3. *See Bouman,* 940 F.2d at 1225 (racial disparity shown when plaintiff demonstrates violation of the 80% rule and that adverse impact is statistically significant).

The City challenges Plaintiffs' showing by offering the following evidence: (1) The City's decision to lower the passing score of 70% for the completed written examination to 56.8% was to enable more Hispanic officers to pass the written test. (2) The revised passing score resulted in the selection of 25 Hispanics for the oral examination. Exh. 831.87. (3). The selection rate for Hispanic candidates (25/29) was 90.4% of that for white candidates (103/108), such rate clearly satisfying the 80% rule. Exh. 831.87.

Plaintiffs raise two primary objections to the City's analysis. The City acknowledges that the pass point selected "was primarily, but not solely, influenced by adverse effect considerations." Exh. 686. First, Plaintiffs object to the lowering of the pass point after the test was administered in order to satisfy the 80% rule, arguing that the use of a race conscious factor in setting the pass point after the test is administered is unlawful unless certain criteria are satisfied.[3] *Compare San Francisco Police Officers' Ass'n v. City and County of San Francisco,* 812 F.2d 1125, 1132 (9th Cir.1987), *op. withdrawn, on reh'g,* 842 F.2d 1126, 1128 (9th Cir.), *amended,* 869 F.2d 1182 (9th Cir.1988) (*Police Officers' III*), *cert. denied,* 493 U.S. 816, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989) (disapproving of a scoring system that changed the relative weight of different components of an examination as a means of minimizing its adverse impact on minorities) *with Officers for Justice v. Civil Serv. Com'n,* 979 F.2d 721, 723–28 (9th Cir.1992), *cert. denied, sub nom. San Francisco Officers Ass'n v. City and County of San Francisco,* 507 U.S. 1004, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993) (approving a procedure that permits "banding" of scores and treatment of scores within a statistically derived "band" as substantively equivalent for purposes of the examination). Second, moving the pass score to satisfy the 80% rule while still using the test scores as a ranking device for promotion did nothing to improve the chances for promotion of those who were made to "pass" with the revised pass score. As Plaintiffs state, "applicants taking the test are seeking appointment, not placement on a list at a level which cannot conceivably result in appointment." Pls. Brief, p. 10. Thus, any test could be made to satisfy the 80% rule without addressing the disparate impact in the practical application of the test as a selection device.

■ The Court agrees with Plaintiffs that the City's decision to drop the pass point afforded no meaningful opportunity for the additional Hispanic (and white) applicants to be promoted. Thus, to rely on statistics that appeared to satisfy the 80% rule but that did not in practical application alleviate the disparate impact of the test as a selection device does not comport with the meaning and purpose of Title VII in seeking to achieve equal opportunity for selection and advancement in employment. *See, e.g., Connecticut v. Teal,* 457 U.S. 440, 449, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982) (stating that Congress' primary purpose in enacting Title VII "was the prophylactic one of achieving equality of employment 'opportunities' and removing 'barriers' to such equality") (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971)); *Teamsters v. U.S.,* 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977) (holding that "a primary objective of Title VII is prophylactic: to achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees"). The manipulation of the pass point to satisfy the 80% test did not improve the employment opportunities of the Hispanics so affected. The Court therefore

---

**3.** While Plaintiffs cite criteria that must be satisfied in order to alter the scoring system ex post facto, Pls. Brief, pp. 11–12, the Court does not find a "test" as such in either of the cases cited by Plaintiffs.

finds that Plaintiffs have shown a racial disparity as to the written examination.[4, 5]

### (a)(2) Whether racial disparity was shown as to the service requirement and seniority point bonuses.

Plaintiffs also contend that the SAPD "rule which limits appointment to supervisory positions to those who are already currently and permanently employed by the City" is a barrier that, they suggest, would necessitate a comparison of the selection rates for "otherwise-qualified applicants." Pls. Brief, p. 18. They assert that the SAPD's policy barring lateral applicants for sergeant positions while hiring bilingual lateral officers caused a disparity, since the Hispanic bilingual lateral officers were ineligible for appointment to sergeant.[6]

■■■ Both parties conduct the disparate impact analysis comparing the racial composition of the at-issue jobs to that of "other-wise-qualified" applicants for the jobs, *see Wards Cove*, 490 U.S. at 651, 109 S.Ct. at 2121, but disagree over the relevant labor pool to use in this analysis. *See, e.g.*, Pls. Brief, p. 18; Def. Brief, pp. 8–10. In instances in which a characteristic of the challenged selection device makes use of the actual pool of applicants inappropriate, "disparate impact may be established through reference to a reasonable proxy for the pool of individuals actually affected by the alleged discrimination." *Moore*, 708 F.2d at 482. *See also Teamsters v. U.S.*, 431 U.S. 324, 365, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977) ("The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to

---

**4.** Since the Court disagrees with the City's use of the lowered pass point to establish the number of applicants to be used for purposes of statistical analysis (i.e., 134 applicants were "passed" with the revised scores), the Court is unpersuaded by the City's calculation of statistical significance using this number. *See* Exh. 831.87.

**5.** Plaintiffs also allege that the overall selection process had a disparate impact on Hispanic officers, and both Plaintiffs and the City compared the selection rates of Hispanic and white candidates in the overall selection process. *See, e.g.*, Pls. Brief, pp. 14–16; Def. Closing Brief ("Def. Brief"), pp. 4–7.

The Court notes that the disparate impact analysis as to the overall selection process is influenced by the fact that the written examination was used to rank the 144 candidates on an eligibility list from which promotions were eventually made. Exhibit 666.3 suggests that the City was aware of this issue as well. ("Because of the difference in Mean scores [on the written examination] between the mexicans [sic] and the Whites, it is obvious that ranking with the use of the written test score will have adverse impact on Mexicans [sic].... [This] will cause Whites to be near the top of the list and Mexicans [sic] to be at the lower part of the list ... it might be adviseable [sic] to use the test as a pass/fail and rank candidates [on another basis].") Thus, while all 72 candidates on the eligibility list were technically considered "qualified" for promotion (i.e., could be considered for the promotion), an applicant's placement on the eligibility list clearly determined whether he had a realistic opportunity for promotion. As a consequence, using the 72 candidates on the eligibility list as the sample size is questionable since some applicants who were eligible to take the oral test did not, Exhs. 684, 685, perhaps because they believed there was no realistic opportunity for promotion given the written exam results; and some did not pass the oral test, as required to qualify for the eligibility list, Exhs. 168, 812. As such, the Court does not separately analyze disparate impact as to the selection process itself, since it appears that the disparate impact shown in the written examination is responsible for a similar disparate impact in the overall selection process.

**6.** Plaintiffs also contend that the use of seniority point additives for up to ten years' prior experience in the SAPD combined with the service requirement for eligibility to create a disparate impact on Hispanics, since many of the Hispanic officers were hired as laterals from other police departments. While Plaintiffs do not offer isolated statistical analyses for selection rates based on the seniority point additives, the Court does note that the recent hiring of 70 Hispanic officers to a mostly white police department during 1975–77 (prior to the 1978 promotion selection) meant that the benefit of the seniority point system would fall disproportionately on those who had been there longer, i.e., the non-Hispanic officers. *See* Pls. Brief, p. 20. *See also* Exh. 865.2. On the other hand, as the Court discusses in (b) *infra*, and as the City argues, *see* Def. Supplemental Brief ("Def. Supp. Brief"), pp. 17–18, the seniority point additives appear to be a bona fide seniority system outside the purview of Title VII. The Court therefore considers Plaintiffs' claim of disparate impact in the selection process as to the service requirement alone, and adopts the analysis in (b) *infra* as to the seniority point additives.

subject themselves to the humiliation of explicit and certain rejection."); *Wards Cove*, 490 U.S. at 651, 109 S.Ct. at 2121 ("If the absence of minorities holding such skilled positions is due to a dearth of qualified non-white applicants (for reasons that are not [defendant's] fault, [defendant's] selection methods or employment practices cannot be said to have had a 'disparate impact' on nonwhites."). The choice for a "reasonable proxy for the pool of individuals actually affected" is "usually between general population statistics and the statistics of a relevant labor market." *Moore*, 708 F.2d at 482.

In a case such as this—where special skills or qualifications are required for the job—"the proxy pool must be that of the local labor force possessing the requisite skills." *Id.* at 482–83. Since only employees of the SAPD were eligible to apply for the sergeant position, the relevant labor market would consist only of those candidates who satisfied that criteria.[7] Exh. 168.1. Plaintiffs offer the following evidence in support of their disparate impact claim: (1) Hispanics between late 1977 and early 1980 represented between 21% and 25% of the rank-and-file SAPD officers. Exhs. 40, 41.5, 689, 867. (2) Until one Hispanic was appointed in 1979, after the filing of this lawsuit, there were no Hispanic sergeants in the SAPD.[8] (3) When there is a zero number of Hispanics, there will always be a violation of the 80% rule as a mathematical certainty. Exhs. 660.2, 660a.2, 660b.2, 660c.2, 870.5.

The City responds that the percentage of rank-and-file SAPD officers—well above the Hispanic population in the relevant census codes—reflects the City's substantial minority recruitment efforts from 1973–1977.

("Greater differences in selection rates would not necessarily be regarded as constituting adverse impact ... where special recruiting or other programs cause the pool of minority ... candidates to be atypical of the normal pool of applicants from that group." Federal Executive Agency Guidelines on Employee Selection Procedures ("FEA Guidelines"), Sec. 60–3.4(G) (November 19, 1976) (Exh. 188.4); Uniform Guidelines, Section 3.D, 43 Fed.Reg. at 38297 (Exh. 189.9)).

The Court is unpersuaded by the City's argument, and believes that the requirement of time-in-service with the SAPD to compete for the sergeant position caused racial disparity. The City created the relevant labor market by its special recruitment efforts. As the purpose of Title VII is to ensure equal *opportunity* to employment and advancement, the Court finds that the City's reliance on its recruitment efforts to justify the low selection rates of Hispanics to sergeant positions eviscerates this goal of Title VII. Plaintiffs have made a sufficient showing of disparate impact in promotions due to the service requirement, since the City's efforts to facilitate the entrance of Hispanics into the SAPD without the dual goal of providing equal *opportunity to* promotions is inconsistent with Title VII protections.

**(b) Whether racial disparity was shown as to the City's merit pay policy.**

Plaintiffs allege that the City's policy for awarding merit pay had a disparate impact on Hispanics because of the in-service requirement. Pls. Amended Reply Brief ("Pls. Reply"), p. 12 (purpose of analysis is to determine "whether the in-service requirements resulted in a disparate impact on Hispanic officers hired post-[A]ct"). As evi-

---

**7.** The City concludes from the census data that there is no barrier to Hispanics to becoming an *officer* in the SAPD. *See, e.g.*, Def.Supp.Brief, p. 10. But the relevant inquiry in this case is whether there were any barriers to becoming a *sergeant* in the SAPD. It appears that the in-service requirement would qualify as such a barrier, since non-SAPD officers were eliminated from the qualified applicant pool.

**8.** The City includes the one Hispanic who was promoted to sergeant after the filing of this lawsuit in its analysis. Plaintiffs contend, and the Court agrees, that the inclusion of this applicant is improper for the purposes of calculating dispa-

rate impact. *See, e.g., Gonzales v. Police Dept., City of San Jose, Cal.*, 901 F.2d 758, 761–62 (9th Cir.1990) (and cases cited therein) ("[L]ooking at the [Police] Department's record of performance after the courts have been asked to intervene is irrelevant to the merits of a discrimination claim and can be highly misleading ... the fact that improvements or advancements undertaken after lawsuits have been initiated drastically reduces the probative value of such evidence."); *Bouman v. Block*, 940 F.2d 1211, 1227 (9th Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991) (same).

dence, Plaintiffs offer Exhibits 660.2–660c.2. Based on the numbers therein, the Court finds that the selection rate of Hispanic officers for merit pay at level E (44/65) was 79.3% of that for white officers (140/164).

The City claims Plaintiffs' numbers are erroneous for two reasons: (1) the numbers include officers who were awarded level E merit pay prior to March 24, 1972, when Title VII became applicable to the City. (2) The numbers include officers who were ineligible for level E merit pay for failure to satisfy the time-in-grade requirements. According to the City, there is no violation of the 80% rule because Hispanics were awarded level E merit pay (41/62) at 85.3% of the rate for whites (69/89). Exh. 305.2.

Additionally, the City alleges that Plaintiffs' challenge to the in-service requirement is insufficient to make out a claim under Title VII, since the requirement amounts to a "seniority system" that is specifically excluded from the purview of Title VII. Title VII, Section 703(h); 42 U.S.C. § 2000e–2(h) ("[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system."). *See also California Brewers Ass'n v. Bryant,* 444 U.S. 598, 605–06, 100 S.Ct. 814, 815, 819, 63 L.Ed.2d 55 (1980) (defining a "seniority system" as a "scheme that ... allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase. Unlike other methods of allocating employment benefits and opportunities ... the principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment."). Section 703(h) protects seniority rights notwithstanding that minority workers may often be hired most recently and hence may be

disadvantaged by strict adherence to seniority. *Teamsters v. U.S.,* 431 U.S. at 349–53, 97 S.Ct. at 1861–64. According to testimony of City personnel officers, the City's merit pay system rewards an employee based upon the seniority criteria of length of employment (e.g., 12 months for merit pay at level D, 30 months for merit pay at level E) and the non-seniority criteria of performance above job standards.[9] Def.Supp.Brief, p. 16–17; Exh. 165. Thus, the City contends that this "routine application of a bona fide seniority system [is not] unlawful under Title VII ... even where the [City's] pre-Act discrimination resulted in whites having greater existing seniority rights than [Hispanics]." *Teamsters,* 431 U.S. 324, 352, 97 S.Ct. 1843, 1863, 52 L.Ed.2d 396 (1976). *See also American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982).

The Court believes, based upon Plaintiffs' own allegations, that their challenge amounts to a challenge of a seniority system implemented by the City. Plaintiffs presented no evidence to show that the failure to credit proper service differentiates in any way between prior service by Hispanics and whites. *See, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (finding no violation of Title VII when there was no evidence that the employer's "failure to credit prior service differentiates in any way between prior service by males and prior service by females"). Thus, "the disparate impact theory of proving discrimination is unavailable if the evidence supports the [City's] allegation that the racial imbalance ... is due to a facially neutral bona fide seniority system.... Rather, the plaintiffs must in addition show that the [City] adopted the system specifically because of its discriminatory impact." *Bonilla v. Oakland Scavenger Co.,* 697 F.2d

---

**9.** Plaintiffs' reliance on *Bouman v. Block,* 940 F.2d 1211 (9th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991), for the proposition that "promotional selection devices which emphasize years of experience in a particular department ... must be validated ..." is inapposite. In *Bouman,* defendant County argued that the statistical differences in performance were correlated to experience, since "the longer a test-taker has been a Deputy Sheriff the higher he or she is *likely* to score on the sergeant examination ..." *Id.* at 1227 (emphasis added). However, the selection device in *Bouman* was not a seniority system intended to be excluded under Title VII (and thus did need to be validated), as performance was merely correlated with experience. A bona fide seniority system, on the other hand, "dispens[es] preferential treatment on the basis of experience." *California Brewers Ass'n,* 444 U.S. at 606, 100 S.Ct. at 819.

1297, 1302 (9th Cir.1982), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984) (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)). Plaintiffs do not allege that the in-service requirement was adopted with discriminatory intent, nor do they offer any evidence of such intent. Therefore, the Court finds that Plaintiffs have not made a showing of disparate impact in the award of merit pay.

**(c) Whether racial disparity was shown as to the City's policy regarding Crime Scene Investigator ("CSI") pay.**

 Plaintiffs claim that the City's policy regarding the award of CSI pay had a disparate impact on Hispanics, alleging that only Hispanic officers were used as crime scene investigators without formal appointment or the pay additive. Plaintiffs contend that "a policy which by definition applies only to Spanish-speaking officers" is unlawful. Plaintiffs offer no statistical evidence in support of their claim that Hispanic officers were denied CSI pay more frequently than white officers. *See* Pls. Brief, p. 29. Rather, they claim that "policies which [are] described as being unlawful stereotyping [can] establish a prima facie showing even without a comparison pool analysis." *Id.*

The Court disagrees. Plaintiffs' reliance on *U.S. v. Armstrong,* 48 F.3d 1508 (9th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301, (Oct. 30, 1995), for the proposition that no statistical showing of disparate impact is necessary in this case is inapposite. *Armstrong* concerned a claim for selective prosecution, where the Court found that the record contained statistical evidence tending to show that only members of racial or ethnic minority groups had been prosecuted, and therefore, that no "comparison pool" analysis was required. *Id.* at 1517,

n. 6. First, Plaintiffs present no argument or authority—nor is the Court aware of any—that makes proper the use of elements that satisfy a prima facie showing of selective prosecution to make out a Title VII disparate impact claim.[10] Second, Plaintiffs have failed to present evidence that only Hispanics had been required to do CSI work without the pay additives. Plaintiffs are required at least to make some showing beyond the mere assertion that Hispanic officers were illegally denied CSI pay. The Court thus finds that Plaintiffs did not satisfy their burden of showing a racial disparity in the award of CSI pay.[11]

**3. Demonstrate a causal connection between the specified employment practice and the racial disparity.**

 The City contends that Plaintiffs have failed to meet an essential element of their claim—that they individually have suffered harm. To maintain a claim for disparate impact in individual actions such as this, a plaintiff must prove that the specific employment practice challenged caused injury to him. *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981) ("It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured."). *See also Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1016 (1st Cir. 1984); *Maresco v. Evans Chemetics,* 964 F.2d 106, 115 (2nd Cir.1992) ("In order to establish a prima facie case of age discrimination by showing disparate impact, [plaintiff] must first identify a specific employment practice having an adverse impact upon members of the protected class and then show causation, i.e., that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." (citations omitted)). In order to demonstrate

---

10. Citing *Armstrong,* Plaintiffs assert that the Ninth Circuit "first analogized selective prosecution analysis to other equal protection or disparate impact analyses." Pls.Brief, p. 21. Plaintiffs' only explanation of this assertion is a cite to *Armstrong,* 48 F.3d at 1513. The Court does not believe that the *Armstrong* Court intended to hold that selective prosecution analyses would be analogous to Title VII disparate impact analysis.

11. The Court notes that Plaintiffs' claim as to the CSI pay again seems to relate to time-in-service. *See, e.g.,* Pls.Reply, p. 28 ("No credit was given [Sanchez] for his prior service and experience ..." in awarding CSI pay). If the service requirements form the basis of Plaintiffs' claims as to the CSI pay, the Court notes that the same reasoning placing bona fide seniority systems outside the purview of Title VII would appear to apply, as Plaintiffs have not shown otherwise. *See* A.2.(b) *supra.*

individual harm, the individual plaintiff must show that application of the specific discriminatory practice has caused him to suffer a significant adverse effect. *Ross v. Buckeye Cellulose Corp.,* 733 F.Supp. 363, 377 (M.D.Ga.1990), *aff'd in part, rev'd in part on other grounds,* 980 F.2d 648 (11th Cir.1993) (citing *Hill v. Seaboard Coast Line R. Co.,* 885 F.2d 804, 811 (11th Cir.1989)).

The City argues that neither Plaintiff has shown that he was individually injured by any of the challenged employment practices. The City contends that Plaintiff Sanchez did not take the 1977–78 sergeant examination because he was not interested in the position at the time.[12] The City asserts that no evidence was presented to show that Sanchez chose not to take the sergeant examination because of "a system which afforded him no recognition or credit for actual service, experience and demonstrated ability," as Sanchez alleges.

Were it indeed true that Sanchez was deterred from applying for the sergeant position due to the alleged discriminatory practice, the Court believes that Sanchez could satisfy the requirements for a prima facie showing of disparate impact.[13] *See, e.g., International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 367, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977) (holding that a plaintiff may be entitled to recover for discrimination despite failure to apply for the position where "an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him"); *Bouman v. Block,* 940 F.2d 1211, 1221 (9th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658

(1991) (finding that plaintiff had standing to bring a claim for discrimination even if he did not apply for the position he claims was closed to him because of discrimination). However, the Court does not find that Sanchez presented any testimony or evidence indicating that he would have taken the examination but for the allegedly discriminatory in-service requirement. As such, the Court questions whether Sanchez has demonstrated a sufficient causal connection between the hiring practice in question and any individual injury.

As to Plaintiff Torres, the City contends that while Torres did take the 1977–78 sergeant examination, he would not have placed high enough on the eligibility list to have been certified for promotional selection under any circumstances. In support, the City maintains: (1) if the written examination were entirely eliminated, Torres would place only forty-fourth on the list from which thirteen of the first seventeen were eventually promoted. (2) If the written examination and seniority credit points were eliminated, Torres would rank only thirty-seventh or thirty-eighth on the list. The Court notes one additional circumstance: as plaintiffs did not present evidence to challenge the oral examination, the results of which were given equal weight to the results of the written examination and then averaged in determining placement on the promotion list, Torres would have placed only nineteenth on the list even had he placed first in the written examination.[14] Even with the elimination of the allegedly discriminatory practices, Torres would not have ranked high enough to have been eligible for promotion.[15] As such, the

---

**12.** Sanchez testified that he did not take the examination because he had recently been married and was enjoying his position as a patrol officer.

**13.** The City argues that Plaintiffs' focus on standing is misplaced, since the City's contention is that Plaintiffs failed to satisfy the causation component of their prima facie case. However, as suggested in *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981), the case relied upon by the City, the analyses of standing and causation involve overlapping issues in this context.

**14.** While Plaintiffs' Pretrial Conference Statement cites the oral examination as a source of

disparate impact, no evidence was presented on the issue at trial. Pls. Pretrial Conference Statement, p. 22.

**15.** Torres's reliance on *Stephen v. PGA Sheraton Resort, Ltd.,* 873 F.2d 276, 279–80 n. 5 (11th Cir.1989) and *Ross v. Buckeye Cellulose Corp.,* 733 F.Supp. 363, 378 (1990), aff'd in part, rev'd in part on other grounds, 980 F.2d 648 (11th Cir.1993), are inapposite, since plaintiffs in these cases and others cited therein were denied a promotion *because of* the discriminatory policy. In this case, Torres would not have been granted a promotion even were it not for the City's allegedly discriminatory practices, since his performance on the oral examination—that component

Court questions whether Torres has shown a sufficient causal connection between the practices in question and individual injury.[16]

Plaintiffs offer the following grounds as evidence that Plaintiffs suffered individual harm: Their disparate impact claim is to the entire 1977–78 sergeants' selection process, and both Torres and Sanchez were "clearly impacted" by that process. Pls. Reply, p. 25. (a) Plaintiffs argue that a "properly administered test with valid, job-related components would have produced entirely different results in rank order, which would have fairly reflected the superior qualifications that the lateral transfers had in education, experience as both officers and often as supervisors, and in the application and implementation of community policing." Pls. Reply, p. 26. (b) Plaintiffs challenge the City's policies that allegedly favored insider applicants over lateral transfers, by requiring that each applicant have one year of experience with the SAPD in order to even compete; excluding from the test any attempt to measure the police-community relations skills; and adding points to the test scores for seniority. Plaintiffs contend that had the SAPD not had an in-service requirement to compete for sergeant in 1975 or 1977, Sanchez would have applied for the position. The procedures

therefore caused harm to Sanchez because he could not apply for the position of sergeant, despite his rank of sergeant in his prior employment.

▮ The Court finds that the two main claims advanced by Plaintiffs to show individual injury are based (a) on general allegations that the test was invalid; and (b) on the in-service requirement. As to the general allegations challenging the selection process as a whole, *Wards Cove* requires Plaintiffs to demonstrate that the alleged racial disparity is the result of one or more of the challenged employment practices, "specifically showing that each challenged practice has a significant disparate impact on employment opportunities for whites and nonwhites." [17] *Wards Cove,* 490 U.S. at 657, 109 S.Ct. at 2125. 42 U.S.C. § 2000e–2(k)(1)(B)(i). Plaintiffs have failed to do so. As to claims that the in-service requirement had a disparate impact, the Court finds that this challenge is to elements of a seniority system that Plaintiffs do not refute. *See* A.2.(b) *supra.* As such, they would not be actionable under Title VII disparate impact.

Though the Court has some questions as to whether Plaintiffs have satisfied their showing of causation, the Court proceeds to con-

being unchallenged by Plaintiffs—rendered him ineligible for placement sufficiently high enough on the list for promotion even had he placed first in the written examination.

**16.** Since the Court found that Plaintiffs had failed to show that the City's policy for awarding merit pay and CSI pay had a disparate impact on Hispanics under Title VII, the Court need not consider the question of causation as to these claims. The Court does note briefly that Plaintiffs' allegations of injury have to do with the claim that Plaintiffs were ineligible *because* of the in-service requirement. *See, e.g.,* Pls. Reply, pp. 27–29 ("Torres was not at merit step E because he did not have sufficient in-service time with SAPD. Thus he was clearly affected by that policy.") Again, the Court believes that the City presented evidence that the policies challenged constituted bona fide seniority systems outside the purview of Title VII.

**17.** Under Section 105 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(k), enacted after the Supreme Court's decision in *Wards Cove,* a plaintiff is *not* required to demonstrate that each particular challenged employment practice

causes a disparate impact if plaintiff can demonstrate to the court that the "elements of a [defendant's] decisionmaking process are not capable of separation for analysis." There is some question as to the retroactive effect of different provisions of the Civil Rights Act of 1991. *See Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (relying on the presumption against retroactive application of legislation to find that Section 102 does not apply retroactively). Neither party presents argument on this point, and the Court believes that Section 105 would fall under those types of statutes considered by the Supreme Court to be subject to the traditional presumption against retroactivity. *See Landgraf, id.* 511 U.S. at ——, 114 S.Ct. at 1505 (citing statutes that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed" as those subject to the traditional presumption against retroactivity). While retroactive application of Section 105 arguably "would vindicate its purpose more fully," the Supreme Court found that such a consideration is insufficient to rebut the presumption against retroactivity. *Id.* 511 U.S. at ——, 114 S.Ct. at 1507–08.

duct the remainder of the disparate-impact analysis.

## B. The City's defense

█ Assuming, *arguendo*, that Plaintiffs showed that the challenged practices caused them individual injury (*see* A.3. *supra*), and that they therefore established a prima facie case of disparate impact as to the written examination, the burden then shifts to the City to produce evidence that its disparate employment practices are based on legitimate business reasons. *Rose*, F.2d at 1424. "This phase of the disparate-impact case contains two components: first, a consideration of the justifications an employer offers for [its] use of these practices; and second, the availability of alternative practices to achieve the same business ends, with less racial impact." *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125. The Court considers each of the components in turn.

### 1. Legitimate business justification.

█ At the justification stage of the disparate impact analysis, "[t]he touchstone of [the Court's] inquiry is a reasoned review of the employer's justification for [its] use of the challenged practice."

> A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster ...

*Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126. Under *Wards Cove*, "the employer carries the burden of producing evidence of a business justification for [its] employment

practice. The burden of persuasion, however, remains with the disparate-impact plaintiff."[18] *Id.*

### (a) Written examination.

█ Once Plaintiffs prove a prima ·facie case of disparate impact, the City is required to validate the selection device by showing that it has "a manifest relationship to the employment in question." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The City thus must show that the challenged practice is a realistic measure of job performance, *Bouman*, 940 F.2d at 1228, or "that the test actually measure[s] skills, knowledge, or ability" required for successful "performance on the job." *Clady v. County of Los Angeles*, 770 F.2d 1421, 1427–28 (9th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986).

█ The City asserts that in November, 1977, the urgent need for sergeants to supervise the rapidly increasing number of police officers, in light of several police-involved shootings and deaths and the liability the City may have faced for any insufficient supervision of officers, justified going forward with the sergeant exam at that time. Additionally, requiring a police officer to attain a certain score on an examination prior to promotion serves—as do other such devices testing employees on their ability to perform in a new position—the goal of promoting qualified candidates according to their abilities.

Furthermore, the City claims that the written examination was validated in accordance with FEA Guidelines.[19] Section 60–3.5(h) of the FEA Guidelines provides that:

> Users may continue the use of a selection procedure which is not at the moment fully supported by the required evidence of va-

---

**18.** While this allocation of burden was changed by Section 105 of the Civil Rights Act of 1991, the Court does not apply this provision retroactively. *See Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

**19.** Plaintiffs argue that the City has failed to show that it falls under the good faith exception to liability found in the EEOC Guidelines concerning the use of a provisional test. Pls. Reply,

pp. 12–16. However, it is uncontroverted that the FEA Guidelines, which contain no good faith exception, govern in this instance. Additionally, the City asserts that it has never pled the good faith exception as a defense. Def.Supp.Brief, pp. 11–13. As the Court agrees that it is the FEA Guidelines that apply, it does not consider Plaintiffs' arguments as to relevance of the good faith exception under the EEOC Guidelines.

lidity, provided: (1) the user can cite substantial evidence of validity in accord with these guidelines and (2) the user has in progress, when technically feasible, studies which are designed to produce the additional data required within a reasonable time. Federal Executive Agency Guidelines on Employee Selection Procedures ("FEA Guidelines"), Sec. 60–3.5(h). Exh. 188.5. As to the second requirement, the City contends that it had "in progress ... [a study] ... designed to produce the additional data within a reasonable time." In December, 1976, the City hired Biddle & Associates as part of a consortium-effort to develop a selection procedure for the position of sergeant which was fully validated in compliance with the FEA Guidelines.

As to the first requirement that the City "cite substantial evidence of validity in accord with the [FEA] [G]uidelines," the City offers a Content Validity Report prepared by Biddle & Associates. Exh. 809. See Def.Supp.Brief, pp. 20–23, for City's description of the validation process. Plaintiffs challenge the results of the Content Validity Report on two grounds. First, Plaintiffs dispute the findings of validity to the extent that the selection process allegedly did not test for skills needed for the City's new Community Oriented Policing ("COP") Program, on the basis that to be valid, "the content universe [must] include[ ] all, or nearly all, important parts of the job." *U.S. v. City of Chicago*, 573 F.2d 416, 425 (7th Cir.1978) (citing EEOC Guidelines). Plaintiffs assert that the test components did not test for any of the topical areas related to community policing, such as the applicant's knowledge of Hispanic and immigrant communities; his knowledge, ability, and predisposition toward the administration of a community-based policing program; and his ability to supervise persons of different cultural backgrounds.

The City disputes Plaintiffs' assertions on two grounds. First, while no specific questions about the COP Program were tested given that the program was new and evolving, and thus did not lend itself to specific questioning of specific policies, the examination did test for the skills needed for community policing. For instance, the Content Validity Report showed that human behavior, communication, and the exercise of tact were identified in the Job–Related Job Description as being an essential part of the job of sergeant. Other skills needed for effective community policing were also evaluated in the oral interview. Second, the FEA Guidelines do not require that a selection procedure test for all of the knowledge and skills necessary to perform a job. Instead, it must "represent[ ] a critical performance domain or a substantial proportion of the performance domains of the job." FEA guidelines, Sec. 60–3.12(c)(6). Exh. 188.8.

The Court finds that though the test did not include specific questions about the COP Program, the skills and knowledge areas necessary to a sergeant implementing a community policing program were included in the Content Validity Report. Thus, while not specifically mentioned, the skills utilized in the COP Program were evaluated. Furthermore, the Court finds that the Content Validity Report satisfied the FEA Guidelines in that it represented a substantial proportion of the performance domains of the job of sergeant. *See* Exh. 809.

Plaintiffs' second objection as to the Content Validity Report is that the written and oral components of the test were not retained by the City, although it was aware that the test had a disparate impact on Hispanic applicants. As such, Plaintiffs have no means of rebutting the report or having an independent study done by their own content-validity expert. The Court notes that the City returned the test to the Cooperative Personnel Services ("CPS"), a division of the State Personnel Board responsible for developing the test, as was required. The test was not retained by the CPS in the due course of business and in fact, was destroyed by the CPS before either Plaintiffs or the City requested that the test be returned for purposes of this lawsuit. The fact that the test was unavailable is therefore insufficient to invalidate the showing that the City has made. The Court is thus satisfied that the City has carried its burden of production as

to a business justification for the examination.

#### (b) Seniority credit system.

As the Court found that Plaintiffs did not establish a prima facie showing of disparate impact in the use of seniority credit points in the selection process or in the award of merit pay, *see* A.2.(b) *supra*, the Court need not consider the business justifications offered by the City in support of this practice. The Court does note briefly that the proffered reasons, of rewarding longevity and encouraging retention of City employees, are consistent with those supporting other lawful seniority systems. *See, e.g., California Brewers Assn.*, 444 U.S. at 607, 100 S.Ct. at 820 ("Congress ... intended to exempt from the normal operation of Title VII ... [a] seniority scheme that ... effectuate[d] the principle that length of employment will be rewarded").

#### (c) Requirement that candidate have completed probation.

■ The City's requirement that promotional candidates have completed a period of probationary employment had a disparate impact on Hispanic officers who were newer hires to the SAPD. Exh. 168 (requiring "[p]ermanent status as a police officer with the City of Santa Ana" to be eligible for promotion). The City asserts that this requirement served its legitimate employment goals of "properly evaluat[ing] its new hires and limit[ing] promotional candidates to those adequately prepared to supervise under the City's policies and procedures." Def. Supp.Brief, p. 26. The Court finds that the City clearly has a legitimate business interest in seeing that its candidates for sergeant know and have experience with the SAPD, with City operations, personnel, and procedures; and that the requirement of probationary employment serves that purpose. The City has thus met its burden of production on this issue.

#### (d) Special CSI pay and Career Development Program.

Since the Court found that Plaintiffs did not establish a prima facie case of disparate impact as to the award of CSI pay, *see* A.2.(c) *supra*, the Court need not consider the business justifications offered by the City in support of this practice. The Court does note briefly that the proffered reasons—that such policies encourage continued education and reward those who meet specific educational and training requirements—serve a legitimate business purpose of the City to have better educated and trained police officers.

#### 2. Availability of alternative practices.

■ Once the City has carried its burden of production as to a legitimate business justification for the challenged practices, the burden of persuasion remains with Plaintiffs "who must prove that it was 'because of such individual[s'] race, color,' etc., that [they were] denied a desired employment opportunity." *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126. Even if Plaintiffs cannot meet their burden of disproving the City's business necessity defense, Plaintiffs may still prevail if they can show that " 'other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate [hiring] interest[s]'; by so demonstrating, [Plaintiffs] would prove that '[the City was] using [its] tests merely as a pretext for discrimination.' " *Id.* (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

■ · Any alternative practices offered by Plaintiffs must be equally effective as the City's chosen practices in achieving its legitimate employment goals. *Wards Cove*, 490 U.S. at 661, 109 S.Ct. at 2127. " '[F]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.' " *Id.* (quoting *Watson*, 487 U.S. at 998, 108 S.Ct. at 2791). Since " '[c]ourts are generally less competent than employers to restructure business practices,' ... the judiciary should proceed with care before mandating that an employer must adopt" a plaintiff's alternative hiring device. *Id.* (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978)).

■ Plaintiffs offer six alternatives to the City's challenged practices that they contend would have less disparate impact and comparable business utility. *See* Pls. Amended Proposed Findings of Fact and Conclusions of Law, pp. 7–8. Plaintiffs have not articulated reasons as to why these selection devices would be equally effective alternatives, and has simply asserted that they have "offered uncontradicted evidence of alternative devices, which would have improved the City's ability to appoint sergeants qualified to serve in both the traditional role and to implement community-based policing." Pls. Brief, p. 26. Plaintiffs do not satisfy their burden merely by attacking the selection devices of the City.[20] While Plaintiffs thus have failed to carry its burden of persuasion, and the analysis need go no further, *see Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27, the Court will briefly consider each in turn.[21]

■ (a) Using a test developed and customized by Cooperative Personnel Services ("CPS"), a division of the State Personnel Board, to match the SAPD job description, which would include an evaluation of the skills needed to supervise the COP Program.

While Plaintiffs provide no discussion of this proposed alternative, the City contends that this proposal is not a "true alternative," since the written examination given was a standard form examination the City obtained from CPS. As Plaintiffs have not shown why their proposal is an equally effective alternative with less disparate impact, the Court finds that Plaintiffs have not satisfied their burden as to this alternative.

■ (b) Using a test developed and validated by Biddle & Associates to match the SAPD job description, which would include an evaluation of the skills needed to supervise the COP Program.

One of Plaintiffs' proposed alternatives was to wait for the validation process began by Biddle & Associates in early 1977 to be completed and to use that test. Biddle & Associates prepared a job-related job description against which the CPS written examination was measured, and determined that the examination was content-valid and job-related. This validation study was not completed until December 8, 1978. Plaintiffs contend that the relevant portions of the validation process were completed by May, 1978, and that the provisional test process actually used was completed at that time as well. Pls. Reply, p. 21. Thus, no time was saved by not waiting for the validation process to be completed.

The Court does not agree with Plaintiffs. The selection process that began with the administration of the written examination in November, 1977 was completed in May, 1978. Even assuming that the relevant portions of the validation study were completed by May, 1978, additional time would have been required to allow candidates to go through the selection process. Additional sergeants could not be hired until the validated process that Plaintiffs claim could have begun in May, 1978 was completed. This alternative therefore would not have been equally effective in meeting the City's urgent need for sergeants, as it would have postponed their selection for some time.

■ (c) Striking the written test which had the disparate impact, and employing one of the options in (a) or (b).

This proposal, since it requires adopting either (a) or (b), fails as an equally effective alternative for the same reasons discussed *supra.*

■ (d) Permitting lateral transfer officers and applicants to compete in the

---

**20.** Plaintiffs assert that the City "offered no rebuttal or contrary evidence" for their proposed alternatives. Pls. Brief, p. 27. However, the duty is on Plaintiffs to identify alternatives and to show that said alternatives are equally effective in achieving the employer's legitimate business interests. *See Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27. If Plaintiffs fail to carry their burden, the City need not offer rebuttal evidence.

**21.** Since the Court found that Plaintiffs failed to establish a *prima facie* case of disparate impact as to the seniority credit system and the award of CSI merit pay, the Court need not perform the "legitimate business justification" and "equally effective alternative" analyses as to these practices.

sergeants' examination process, while taking into account as proportional and parallel factors in a total assessment process, the knowledge acquired from prior experience in Santa Ana as well as prior experience in the minority communities targeted for the COP Program.

Plaintiffs claim that "there is nothing that would preclude a City from permitting lateral transfer competition for sergeant," and that permitting competition from lateral officers is not inconsistent with requiring all new hires to go through a probationary period of appointment. Pls. Reply, p. 19. Plaintiffs do not present evidence that this proposal is equally alternative. Without more, these assertions do not satisfy Plaintiffs' burden of showing that this proposal is an equally effective alternative in serving the City's legitimate business needs.

The City contends that such an alternative is not equally effective for several reasons. For instance, City personnel testified that lateral hiring of sergeants would create significant morale problems, and that lateral hires would not have the same knowledge of the SAPD, and of City operations, personnel, and procedures as would SAPD hires. Thus, bringing in lateral sergeants would not be equally effective in achieving the City's goal of having fully-prepared SAPD supervisors.

Because Plaintiffs do not present any evidence to show that their proposal is equally effective in serving the City's legitimate business needs as those employed by the City, the Court finds that Plaintiffs' proposed alternative fails.

■ (e) Using a dual test process, with differential testing for those with and without prior supervisory experience, which is then combined into a unified rank order.

Plaintiffs presented no evidence as to why this proposal was an equally effective alternative. As such, the Court is reluctant to mandate that an employer must adopt a plaintiff's alternative hiring device. *See*

**22.** This alternative is not listed in Plaintiffs' Pretrial Conference Statement, but is raised by both

*Wards Cove,* 490 U.S. at 661, 109 S.Ct. at 2127.

■ (f) Employing a banding device and secondary criteria which would take into account as proportional and parallel factors in a total assessment process, the knowledge acquired from prior experience in Santa Ana as well as prior experience in the minority communities targeted for the COP Program.

Again, Plaintiffs presented no evidence as to why this proposal was an equally effective alternative, and the Court therefore finds that Plaintiffs have not satisfied their burden of persuasion.

■ (g) Using assessment centers.[22]

Plaintiffs proposed the use of assessment centers to evaluate candidates. The City presented evidence to show that the use of assessment centers would have been more costly and time-consuming given the number of candidates. Even Plaintiffs' expert testified that use of an assessment center would require 3-4 hours to evaluate each candidate. Under *Wards Cove,* a proposed alternative that represents a substantial financial and time burden does not constitute an equally effective alternative. 490 U.S. at 661, 109 S.Ct. at 2127 ("factors such as the cost or other burdens of proposed alternative selection devices" relevant in determining whether they are equally effective).

## III. CONCLUSION

For the foregoing reasons, the Court FINDS that Plaintiffs made a prima facie showing of disparate impact as to the 1977 written examination for sergeant. The Court also FINDS that the City satisfied their burden of producing legitimate business justifications for the challenged practices, and that Plaintiffs failed to present evidence of equally effective alternatives.

Furthermore, the Court FINDS that Plaintiffs failed to establish a prima facie case of disparate impact as to the seniority

parties in their closing briefs.

credit system and the award of CSI merit pay.

IT IS SO ORDERED.